FREDERICK M. BALLOU *vs.* WELCOME FARNUM & others.

If a mortgage of a railroad has been executed to trustees, for the benefit of bondholders, and the trustees, after entering into possession, lease the railroad to others, but, under a verbal agreement, continue to operate the road for the lessees and receive the earnings, pay the expenses, select, contract with and discharge the persons employed on the road, and exercise all the powers usually exercised by railroad corporations over their own roads, the trustees are personally responsible for an injury sustained by reason of the negligence of one of the persons so employed.

TORT against the trustees named in a mortgage executed by the Norfolk County Railroad Company upon their railroad and franchise, for the benefit of bondholders, seeking to recover for a personal injury sustained by the plaintiff by being run against by a car of the defendants. The answer amongst other things denied that the defendants had managed the road in their individual capacity, or that they were liable for the alleged injury.

At the trial in this court, before the chief justice, the following facts were admitted by the parties :

The defendants were mortgagees and trustees of the Norfolk County Railroad, under a mortgage deed, for the benefit of the first mortgage bondholders ; and had entered on the railroad under said mortgage, and were running the same at the date of

the accident, in August 1862, but for the benefit of the bond-holders and not for themselves, except as follows : On the 22d day of July 1862, the defendants executed a lease of the railroad from Dedham to Blackstone, together with other property used in operating the railroad, to the Midland Land Damage Company, for five years, at a specified rent, payable semi-annually, with provisions that the lessees should take possession thereof and use and operate the same on their own responsibility under the direction of their officers, and keep the same in repair, and not lease or underlet the same, and furnish to the lessors all such statistics and facts as might be necessary for the returns required by law, and that the lessees should have no authority to create any claim or liability whatever, directly or indirectly, on the part of or against the lessors, and that the lessors should be in no way or manner responsible to any persons whatever for any injuries done to persons or property in the running, use or management of the railroad, while in possession of the lessees. On the same day, the defendants verbally agreed with the lessees that they, the defendants, should continue to operate the road for the lessees and receive the earnings, and that after paying the expenses, the balance should be applied by the defendants towards the payment of the rent due from the lessees under the lease, who were to make up the deficiency, if any, necessary to make up the sum named as rent in the lease, the excess, if any, to be paid over to the lessees ; said agreement continuing in force and being acted on till the present time, the defendants receiving the earnings of the road, paying the expenses, selecting, contracting with and discharging the persons employed on the road, and exercising all the powers usually exercised by railroad corporations over their own roads. The defendants received for the year 1862 a sum as earnings greater than the *ad damnum* in the plaintiff's writ.

The track crossing from the Norfolk County Railroad to the Providence and Worcester Railroad, on which crossing the accident occurred, was used by both roads, the switch connecting the former road with the latter being managed by a switchman employed by the defendants as aforesaid, the other switch being

managed by a person employed by the Providence and Worces-ter Railroad. After the accident and on the same day, the switchman who managed the switch connected with the Nor--folk County Railroad was discharged by the defendant Farnum, who both before and since the accident aforesaid, attended to and managed the details of the working of the road.

The defendants contended on the foregoing facts that they could not be held liable in this action, and the chief justice reserved this question for the consideration of the whole court.

*P. C. Bacon & G. F. Hoar*, for the plaintiff. For all purposes of the present case, the defendants, by the execution of the lease, became strangers to the railroad. They entered, however, into two new and subsequent contracts, by which alone their liability in this action is to be determined. First, the contract to operate the road for the lessees, under which they took the entire control and management of it, selecting, contracting with and discharging the persons employed. Secondly, the contract with the switchman whose negligence caused the injury to the plaintiff. The case therefore turns on the question whether a jury might on the evidence have found that the defendants stood in the relation of principals to the switchman, or whether they were themselves agents of the corporation, and the switchman a sub-agent of the same master.

As a general rule, the liability of private persons for the acts of others is determined by the question, whose was the governing will in the employment in which the injury occurred. In the present case, the switchman was the servant of the defend-ants, and the corporation could exercise no rightful authority over him, without terminating their contract with the defend-ants. The corporation could not dismiss him from his employ-ment. The defendants did not stand between the corporation and the persons employed, in the character of intermediate agents, but as masters of those persons. This is true, even though the defendants themselves were agents of the corpora-tion. See *Bell* v. *Josselyn*, 3 Gray, 309 ; *Hilliard* v. *Richardson*, Ib. 349, and cases cited ; *Reedie* v. *London, &c. Railway Co.* 4 Exch. 244 ; *Quarman* v. *Burnett*, 6 M. & W. 499 ; *Milligan* v.

*Wedge,* 12 Ad. & El. 737; *Randleson* v. *Murray,* 8 Ad. & El 109; *Fenton* v. *Dublin Steam Packet Co.* Ib. 835; *Laugher* v *Pointer,* 5 B. & C. 547; *Brady* v. *Giles,* 1 M. & Rob. 494.

*F. H. Dewey & E. B. Stoddard,* for the defendants. It is now conceded that by the lease the defendants became strangers to the railroad. They did not incur a liability to the plaintiff by their verbal contract. This contract was to operate the road for the lessees. They assumed no relation of principals. They did not operate the road on their own account. Their subsequent conduct only shows how they were to execute their authority, and the extent of their authority. But there was no agreement that they should assume any liability for operating the road; and there was no intent that this result should follow. The verbal agreement was on the same day with the lease. It is unreasonable to suppose that so extensive a modification of the lease was intended. The parties could not have intended to nullify it. If the defendants are considered as acting merely as agents of the corporation, there was no variation of the lease, and all is explained. Otherwise, the lease is nullified.

The switchman was the agent of the corporation. He was employed by the trustees in their official capacity. Supposing one of them had died, would not the switchman have continued in his employment? It is said that he was selected by the trustees. But in what capacity did they select him? Was it as agents of the corporation, or as principals? There is no distinction between the contract which the defendants made with him, and that made between every president of a corporation and its servants. Every president or superintendent has power to discharge such servants at will. But the governing will resided in the corporation. The corporation appointed the defendants, and might have terminated their agency any day. By doing so, they could discharge all subordinate servants any day. There is nothing in this case to show that the defendants were acting otherwise than as servants of the corporation.

DEWEY, J. The general principles governing cases of alleged liability of masters for injuries occasioned by the negligence of heir servants have, from the frequency of the occurrence o.

questions of this nature, come to be well settled. The difficulty consists in applying them to any given case in which a new state of facts is developed, and in ascertaining whether the relation and the legal responsibility arising from it attach to the particular case.

In the present case the defendants, having voluntarily assumed the relation of mortgagees of the Norfolk County Railroad, and trustees for the bondholders, and having entered into possession of the road, and taken the control and direction of operating it, under their legal right so to do, became the controlling power in relation to the running of cars upon the road, and the various agents employed in relation thereto, and thus assumed all the responsibility of that position. Such was the state of the road, and such the responsibility of the defendants prior to the 22d of July 1862, when the defendants, being lawfully authorized so to do, executed a lease of the road extending from Dedham to Blackstone, and of its depots, tracks, rolling stock, &c., for a period of five years, under certain conditions therein mentioned, to a corporation known by the name of the Midland Land Damage Company. The effect of this lease, had the lessees entered under it upon the road, and taken upon themselves the running of the trains and the conducting of the operations of the road, would have been to divest the defendants of the right further to control and direct as to the same, and to free them from all liability for negligence of the servants employed by the lessees in operating the road.

For reasons not distinctly stated, but the apparent object of which was the more effectually to secure the payments to be made to them by the lessees, by taking themselves the income of the road which daily accrued from the running of trains, the defendants did not withdraw from the active management, direction and control of the road on the 22d of July, but agreed verbally with the lessees that they, "the defendants, should continue to operate the road for the lessees and receive the earnings, and that, after paying the expenses, the balance should be applied by the defendants toward the payment of the rent due from the lessees under the lease." The understanding of the parties to

this agreement, and their action upon it to the present time, are thus stated in the report of the case made to the court : " The defendants receiving the earnings of the road, paying the expenses, selecting, contracting with and discharging the persons employed on the road, and exercising all the powers usually exercised by railroad corporations over their own roads."

. Such was the *status* of the parties. The defendants were by a lawful agreement in the full exercise of all the powers incident to a supreme control and authority as to the running of trains on the road, and especially so as to the servants employed and connected therewith. Their position was a totally different one from that of a superintendent or conductor authorized to employ servants for a corporation, but over whom and the servants they employ the corporation has the control. Such superintendent or conductor would be responsible only for his own acts, and not for those of the servants thus selected. The corporation would be the party responsible to third persons for any injuries occasioned by the negligence of the persons thus employed.

In the present case, there was above the defendants no such superior power, which had any control over the appointment or continuance in office of the persons employed on the road, or the mode of discharging their duties. It is precisely for this reason that the defendants have made themselves liable as principals, and must take responsibilities as such, looking for their indemnity to the receipts from the earnings of the road, over which they have full control. We have not overlooked the fact that the language of the agreement as stated is, " they shall continue to operate the road for the lessees." The last clause is an ambiguous one, and standing alone it might be supposed to signify that the lessees were to be the principals, although the words may also be satisfied by treating it as a form of expression indicating that the defendants had become substitutes for the lessees. But the construction put by the parties on this new arrangement, and what they intended by it, are made clear by the further statement in the report of the nature of this con tract, and what was the actual mode in which the defendants were to continue to operate the road, and what powers were

and have been at all times exercised by them. The real inquiry is, in whose name were they in fact operating this road? As already stated, they have always exercised the sole power of selecting, contracting with and discharging the persons employed on the road. They exercised all the powers usually exercised by railroad corporations over their own roads. The switchman, whose negligence is alleged to have caused the injury to the plaintiff, was, as is admitted, employed by the defendants, and, in the view we take of this arrangement between the lessees and the° defendants, as to continuing to operate the road, was their servant in the same unqualified sense that he would have been the servant of an ordinary railroad corporation that might have employed him in their business.

The inquiry in each case must be, whether the person whose negligence caused the injury is to be considered as a servant of the defendant. If he be such, then by the rules of law the party who stands in the relation of master is answerable for the injury resulting from the negligence of the servant in the performance of the business committed to his charge. *Laugher* v. *Pointer,* 5 B. & C. 547.

The tests of such relation of master and servant will be found often stated. Thus in *Fenton* **v.** *Dublin Steam Packet Co.* 8 Ad. & El. 835, the owner of a chartered vessel, by retaining the right to appoint and dismiss the officers and crew, made himself liable for the negligence of the crew. In *Quarman* v. *Burnett,* 6 M. & W. 509, it was held that "he who had selected him as his servant, from the knowledge of or belief in his skill and care, and who could remove him for misconduct, and whose orders he was bound to receive and obey," stood in this relation of master, and was responsible for the acts of his servant. In *Dalyell* v. *Tyrer,* 1 El. & Bl. 906, it is said, "The crew of the steam-tug were the servants of the defendants. The defendants had hired and paid them, had entire control over them, and had power to substitute others in their place."

In the case before us, all these circumstances, stated as tests, existed, and must necessarily establish the relation of master and servant between these defendants and the switchman, through

whose negligence the injury is alleged to have occurred. The effect must be to subject them to the ordinary liabilities attaching to this relation, and to make them responsible for an injury to a third person, occasioned by the negligence of such servant in the performance of the business in which he was employed by his masters.

The case therefore must be sent to a new trial.